```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -----------------------------x
                                        16-CR-608(NGG)
 3   UNITED STATES OF AMERICA,
                                        United States Courthouse
 4                                      Brooklyn, New York

 5          -against-                   May 18, 2018
                                        11:30 a.m.
 6   ROLAND BEDWELL,

 7          Defendant.

 8   -----------------------------x

 9           TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
               BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
10                UNITED STATES SENIOR DISTRICT JUDGE

11   APPEARANCES

12   For the Government:        RICHARD P. DONOGHUE, ESQ.
                                United States Attorney
13                              Eastern District of New York
                                271 Cadman Plaza East
14                              Brooklyn, New York 11201
                                BY:  ANDREY SPEKTOR, ESQ.
15                                   NICHOLAS MOSCOW, ESQ.
                                Assistant United States Attorneys
16
     For the Defendant:         LAW OFFICES OF EDWARD V. SAPONE
17                              One Penn Plaza
                                New York, New York 10019
18                              BY:  EDWARD SAPONE, ESQ.

19                              PALMIERI, CASTIGLIONE & ASSOC. PC
                                250 Mineola Boulevard
20                              Mineola, New York 11501
                                BY:  VITO PALMIERI, ESQ.
21
     Court Reporter:            Rivka Teich, CSR, RPR, RMR
22                              Phone:  718-613-2268
                                Email:  RivkaTeich@gmail.com
23
     Proceedings recorded by mechanical stenography.  Transcript
24   produced by computer-aided transcription.

25
```

```
1              (In open court.)

2              THE COURTROOM DEPUTY:  All Rise.

3              THE COURT:  You may be seated in the back.

4              COURTROOM DEPUTY:  Criminal cause for sentencing.

5              Counsel, state your appearances.

6              MR. SPEKTOR:  Good morning, your Honor.  Andrey

7   Spektor and Nicholas Moscow for the United States.

8              MR. SAPONE:  Good morning, your Honor, Edward Sapone

9   for Mr. Bedwell, who is standing to my right and ready to be

10  sentenced.

11             MR. PALMIERI:  Vito Palmieri for Mr. Bedwell as

12  well.

13             THE COURT:  Good morning, everyone.  Good morning,

14  sir.

15             THE DEFENDANT:  Good morning.

16             THE COURT:  This is a sentencing for Mr. Bedwell

17  Mr. Bedwell, are you satisfied with the assistance your

18  attorneys have given you thus far in this matter?

19  THE DEFENDANT:  Okay, very well.

20             THE COURT:  Before we get started, I was just handed

21  a handwritten, two-page document that I don't know what it is,

22  except it's a letter of some kind, Honorable Judge, whatever

23  that judge is, signed by someone.  I don't know who this

24  person is.

25             I've been reviewing these papers for days and all of
```

1     a sudden now I've got something else here from someone who has

2     no address and is just making a statement.

3               What am I supposed to do with this at this stage of

4     the proceedings?  I have hundreds of pages of material, sir,

5     and now I've got this.  You want me to put this off until we

6     figure out who this is, and where it's from, and what its

7     pedigree is?

8               MR. SAPONE:  Not at all, your Honor.  If I may I ask

9     to withdraw that.  It came in this morning.

10              THE COURT:  From where?

11              MR. SAPONE:  An inmate.

12              THE COURT:  It came in to me in the back of this

13    courtroom in the hallway, is where it came in.  It didn't come

14    in with a letter from you.  It didn't come in with an address.

15    It didn't come in with telling me who this person is and how

16    this happened.  This is serious matter.  I gave you plenty of

17    notice that I might upwardly depart, that's because you were

18    entitled to it, I wanted to be fair to your client.

19              MR. SAPONE:  Yes, your Honor.

20              THE COURT:  Now I have something that's like --

21    should I go out and read this now?

22              MR. SAPONE:  Not at all.  If I could just take

23    thirty seconds, your Honor.  I walked into court this morning

24    and that was placed in my hand.

25              THE COURT:  What the heck.  It was placed in your

1    hand, is that how we do business in the United States District

2    Court?

3              MR. SAPONE:  Not at all.

4              THE COURT:  I don't know who wrote this, somebody on

5    the subway could have the written it.

6              MR. SAPONE:  I would like to withdraw that, your

7    Honor.

8              THE COURT:  This is not a way to run a litigation.

9    I'll just leave it here to remind me.

10             What if it were the other way around and I got a

11   nasty letter about Mr. Bedwell and someone handed it to my

12   clerk and I read it in the back and it affected my perspective

13   on Mr. Bedwell negatively, would you like that?

14             MR. SAPONE:  I wouldn't.  You know what, your Honor,

15   I've learned something.  From now on --

16             THE COURT:  Did you share it with the Government?

17             MR. SAPONE:  I did right away.  We actually read it

18   together.  But that was a mistake I shouldn't have given it to

19   you.

20             THE COURT:  Who gave it to you?

21             MR. PALMIERI:  Mr. Bedwell gave it to me, your

22   Honor.

23             THE COURT:  When was that?

24             MR. PALMIERI:  Just this morning when I came in to

25   see him in the back.

```
 1              THE COURT:  Well, it's very troubling.  All right.

 2              Let's get to the business at hand.  I have the

 3    following materials that I've reviewed for the purposes of the

 4    sentencing.  There is a presentence investigation report

 5    prepared March 12, 2018.  Has everyone seen that?

 6              MR. SAPONE:  Yes, your Honor.

 7              MR. PALMIERI:  Yes, your Honor.

 8              THE COURT:  Have you shared it with your client?

 9              MR. SAPONE:  Yes, your Honor.

10              THE COURT:  Good.  There is an addendum to the

11    presentence report dated April 20, 2018, has everyone seen

12    that?

13              MR. SPEKTOR:  Yes, your Honor.

14              MR. SAPONE:  Yes.

15              THE COURT:  Have you shared it with your client?

16              MR. SAPONE:  Yes, your Honor.

17              THE COURT:  Good.  And the addendum primarily

18    discusses the formula for the offense level.

19    THE DEFENDANT:  Yes.

20              THE COURT:  Slightly revises it, but we'll get to

21    that.  There is an extensive sentencing memorandum from the

22    defense dated April 10, 2018.

23              MR. SAPONE:  Yes, your Honor.

24              THE COURT:  Very good job.

25              MR. SAPONE:  Thank you, your Honor.
```

```
1                    THE COURT:  Congratulations.

2                    Then there is the Government's April 19, sentencing

3       memorandum with Exhibits.

4                    MR. SPEKTOR:  Yes, your Honor.

5                    THE COURT:  Have you seen those documents?

6                    MR. SAPONE:  Yes, your Honor.

7                    MR. PALMIERI:  Yes, your Honor.

8                    THE COURT:  In addition, there are several more

9       items.  There is a letter with exhibits from the defense dated

10      May 1st, 2018, which talks about deterrence.  And I think this

11      is in response to the Court advising you that I was

12      considering an upper departure from the guideline range.

13                   MR. SAPONE:  Yes, your Honor.

14                   THE COURT:  Right.  I read that as well.

15                   MR. SAPONE:  Thank you.

16                   THE COURT:  And then there is Mr. Bedwell's letter

17      to the Court that I've read that was provided to the court on

18      May 2, 2018, with a cover letter from the defense.  Have you

19      seen those documents?

20                   MR. SPEKTOR:  Yes, your Honor.

21                   THE COURT:  Then in addition, I'm note sure when we

22      received it, but there is a binder with sentencing memorandum

23      exhibits, have you seen those?

24                   MR. SPEKTOR:  Yes, your Honor.

25                   THE COURT:  I think that came in recently, did it
```

1    not?

2              MR. SAPONE:  Yes.

3              THE COURT:  And then there is a sentencing

4    memorandum from the defense dated April 10.

5              MR. SAPONE:  So the binder and the memo that your

6    Honor just referred to are the hard copies of what was ECF'd.

7              THE COURT:  That's fine.

8              MR. SAPONE:  And the Government has seen it all.

9              THE COURT:  I reviewed all this material.  You've

10   seen that?

11             MR. SPEKTOR:  Yes, your Honor.

12             THE COURT:  I think that's what that's it.

13             MR. SAPONE:  Yes.

14             THE COURT:  Anything else that I'm missing?

15             MR. SPEKTOR:  No.

16             THE COURT:  I've reviewed all these documents and I

17   thank you for the effort that you all put in.  This was an

18   excellent job.

19             MR. SPEKTOR:  Thank you.

20             THE COURT:  By everybody.

21             MR. SAPONE:  Thank you.

22             THE COURT:  At this point let's go over the

23   calculation of the guideline.

24             The defendant pleaded guilty to Count Four of the

25   Indictment charging him with Hobbs Act extortion.  And in his

1    plea agreement he cited to relevant conduct that the Court

2    could consider with regard to Counts Five and Six, I believe.

3    Count Five is Hobbs Act extortion conspiracy, Count Six is

4    attempted Hobbs Act extortion.  Do I have that right?

5            MR. SPEKTOR:  Yes, Judge.

6            MR. SAPONE:  Yes.

7            THE COURT:  Okay.  Now if we look at the addendum to

8    the presentence report, I think there is general agreement

9    that the addendum gets the calculation correct.

10           MR. SAPONE:  Correct.

11           THE COURT:  Is that a fair statement?

12           MR. SPEKTOR:  Yes.

13           THE COURT:  According to the addendum, dated

14   April 20, 2018, the total offense level is a 24.  It's agreed

15   that the defendant is criminal history category one, and the

16   range of imprisonment under the guideline is 51 to 63 months

17   in the custody of the Attorney General.  Everyone agree?

18           MR. SPEKTOR:  Yes.

19           MR. SAPONE:  Yes.

20           THE COURT:  The Court agrees as well.

21           That brings us to the next step of the sentencing

22   process.  By the way, let me ask, are there any victims, other

23   than Mr. Sharp who has written an affidavit that the Court has

24   read, are there any other victims who wish to be heard or who

25   have filed any materials for the Court's consideration?

1          MR. SPEKTOR:  Your Honor, we've made all the victim

2   notifications, I don't believe there are any victims today.  I

3   haven't seen any in the courtroom.  I haven't received any

4   statements from the victims.

5          THE COURT:  Let me ask just generally, anyone in the

6   gallery, are there any victims of the defendant's Hobbs Act

7   extortion who wish to be heard?  Thank you.  Very good.

8          The next step in the process is to consider the

9   relevant factors under 18 United States Code, Section 3553(a)

10  in order to impose a sentence that is sufficient but not

11  greater than that necessary to fulfill the purposes of

12  sentencing.  I will say that in reviewing the record here,

13  initially, before the original date of sentencing it was clear

14  to the Court that some of the defendant's behavior was

15  extremely troubling and that I felt that a sentence in the

16  guideline range might not be sufficient to fulfill the

17  purposes of sentencing in terms of punishment, general

18  deterrence, and dealing with the effect of organized crime on

19  public safety.  And so I advised the parties that I would

20  consider submissions with regard to possible upward departure.

21  Those materials were received and I considered them.

22          And now I would like to hear first from the

23  Government and then from the defense as to the two things,

24  one, whether I should impose a sentence above the guideline;

25  second, what sentence would be appropriate.

1          I do understand that in the plea agreement the

2     defendant agreed that he would not appeal or otherwise

3     challenge a sentence I impose if it is 71 months or below.

4     And of course that is eight months, I believe, below -- above

5     the guideline range.

6          I also understand that the Government has, and the

7     defense have agreed in that document, that the Government

8     could make a recommendation within the guideline range of the

9     sentence that the Court might impose.  So the Government,

10    which ordinarily doesn't make such a recommendation and the

11    plea agreements don't ordinarily have such a provision, the

12    Government negotiated that provision for this plea agreement.

13    So I understand all of that.

14         So let's move on.  Let me hear from the Government

15    as to the factors under 3553(a).

16         MR. SPEKTOR:  Thank you, your Honor.  I'll just say

17    up front that we're asking for 63 months in no way suggesting

18    that a sentence above is what we are recommending.  I want to

19    make that clear.  Obviously there is a range of reasonable

20    sentences, but our position is that 63 months is the sentence

21    that the Government is recommending.

22         I'll start with the conduct.  I think everyone

23    agrees the conduct in this case is serious.  I think the

24    defendant and the defense team agree that it's serious.  It's

25    offensive and has gone on for a long time.  We've submitted to

1     your Honor a recording that a Gregg Sharp made in which the

2     defendant describes exactly what he's been doing for years, so

3     there is no dispute as to what he's done.

4          I'm not going to read into the record all of these

5     exhibits that we've provided, but just to give your Honor just

6     to focus on a few, to highlight how egregious some of this

7     conduct is.  This is what defendant is.  This is what we know

8     he's been doing for years, Exhibit 1B, he said, "Either you're

9     going to sign the contract and your men will live with it, and

10    they will, or these boys are going to do it again.  Now,

11    understand the type of crew I have now.  They don't like the

12    idea that one that their home and this company is working

13    non-union, and these men who don't even belong to this

14    country, are taking their jobs and they don't like it.  They

15    are not happy about it.  Honestly, whatever they do or don't

16    do is pretty much up to them."

17         This is what we know the defendant has been doing

18    for years.  We've been investigating this for more than five

19    years, the FBI organized crime squad.  We know he's been going

20    around extorting construction owners, this is the type of

21    extortion that he's been doing.  We've made clear in our

22    submission, and I talked to defense counsel from the beginning

23    of this case, this is not a case where he shows up with a gun

24    and says your contract or your brain, it's not that case.  But

25    it doesn't make this case any less serious.

1          I think what he's been doing for years, what he's

2     been doing to construction owners and the workers is very

3     serious.  The affect of his conduct is widespread.  Most

4     immediately it affected the construction business, owners, but

5     also a spill-over into the public.  He talked about creating

6     traffic jams, accidents; we know that's true.  He's affected

7     the businesses that need this construction work to be done.

8          I think, moving on from the conduct itself, there is

9     a need for specific deterrence.  The defendant admittedly

10    doesn't have a heavy criminal record, if you look at his rap

11    sheet.  But it's deceiving.  He had hadn't lived exactly a law

12    abiding life.

13         Just before his arrest, according to the PSR, he

14    threw metal debris at another car and was arrested for that.

15    There are other less significant arrests, but I think most

16    importantly, he's been doing this sort of extortion for years.

17    That's the life he's led.

18         And he's talked about it in Exhibit 1H.  He said, "I

19    was shutting everybody down.  I got to be honest with you, I

20    don't know how I don't have any felonies against me."

21         Exhibit 1I, he says, "So I do like I'm one for the

22    rules?  I'm an asshole.  Fuck you and fuck your rules.  I'm

23    going to do what I want to do."

24         In 1J he said, "I don't know care either way because

25    I'll go to jail, I already proved that."

1          In 1M, "I don't care about all the rules and

2    regulations, like I said, the animals I got on the streets now

3    they don't care either.  They are sick.  Don't forget they did

4    six months in jail, they'll laugh at that too."

5          Before the defendant was arrested and I wanted to

6    see what effect an arrest on federal extortion would have on

7    this defendant, someone who was doing this for years, someone

8    who care about going to jail, I wanted to see if it was all

9    puffery or if he would really change with the arrest.  What I

10   saw is he didn't change, Judge.

11         The federal arrest on extortion charges seemed to

12   have no effect on him.  He was released on bail, as your Honor

13   recalls, he continuously violated his bail condition by

14   consuming cocaine.  He did it repeatedly and shockingly after

15   scheduled a hearing about his violation.

16         Your Honor, remanded him.  Then when in jail he was

17   still talking about, he didn't care, he doesn't know why

18   everyone thinks it's such a big deal.  He said in jail, "If I

19   had it in my hands right now, I'd probably do a hit right.

20   Now big deal, doesn't even fucking phase me."

21         The anxiety that he expressed in jail calls was over

22   what Anthony Franco, a knowing Gambino soldier, thought of

23   him, not about the sentence he's getting today, that's what

24   concerned him.

25         THE COURT:  Do you have any information as to what

1    Mr. Franco's role was in the operation of Local 175?

2              MR. SPEKTOR:  Yes, your Honor.  I think his title is

3    funds administrator.

4              THE COURT:  Who is the funds administrator?

5              MR. SPEKTOR:  Mr. Franco is.  But I think he's

6    running the union as far as we understand.

7              THE COURT:  Your position is that he's a made member

8    of the Gambino crime family?

9              MR. SPEKTOR:  Yes, promoted recently to soldier.  He

10   was previously an associate, and now we know him to be a

11   soldier.  One of the victims was brought to see, with

12   Mr. Bedwell, Anthony Franco, which we briefed in our 404B

13   motion.

14             THE COURT:  Say that again?

15             MR. SPEKTOR:  As we explained in our 404B motion,

16   when we thought this case was heading for trial, one of the

17   victims was actually brought to see Mr. Franco, along with

18   this defendant.  What we argued in that motion was that --

19             THE COURT:  I'm sorry, that wasn't Mr. Sharp?

20             MR. SPEKTOR:  No, it was.

21             THE COURT:  It was someone else.

22             MR. SPEKTOR:  Someone else.

23             THE COURT:  Go on.

24             MR. SPEKTOR:  I think what I said about his cocaine

25   use, after he was arrested and after your Honor scheduled a

1    bail hearing, goes to the need for specific deterrence.  As

2    your Honor identified, there is a great need for general

3    deterrence in this case as well there is a need for general

4    deterrence in this industry.  As we know and we've previewed

5    in our letter, the construction industry does have some shark

6    practices.  There are unions who put pressure on construction

7    owners, not to the same extent as the defendant and not to the

8    extent that we believe to rise to federal extortion, but there

9    are some pressures exerted on owners.  I think that a sentence

10   today will send a message within the industry that there is a

11   line not to be crossed.  It's fine to advocate for union, it's

12   not fine to put people in harm's way, to puncture tires, to

13   unhook trailers, to run trucks off the road.

14           THE COURT:  And shut down work sites.

15           MR. SPEKTOR:  Yes, your Honor, shut down work sites

16   as well.  There is a need for deterrence within this union.

17           I was shocked to learn that as of 2017, based on

18   these disclosures that the Department of Labor provided us,

19   that the union has $252,201 of assets for 558 members, which

20   I'm told is not very much, but that paid the defendant $65,000

21   while he was under Indictment the same year where he pled

22   guilty as a former business manager, so he's still collecting

23   a paycheck from the union.

24           THE COURT:  It's not a pension.

25           MR. SPEKTOR:  It's not listed as a pension.  He's

1      listed as a former business manager.

2            I've learned that the union is paying for his

3      defense, as of 2017 it was over $65,000 for his defense.  So I

4      think there is a need to deter the union as well.

5            THE COURT:  That's the same $65,000?

6            MR. SPEKTOR:  No different.  Another $65,000 for his

7      defense.

8            As of 2017, I don't know what it is in 2018.  There

9      is a need to send a message to the union.  Mr. Bedwell should

10     not be replaced with someone like Mr. Bedwell.

11           Finally, your Honor alluded to there is a need to

12     send a message to the organized crime elements in this case.

13     The Gambino crime family tried to isolate itself by employing

14     Mr. Bedwell.  We've made clear Mr. Bedwell is not a member of

15     the Gambino crime family, but a need for deterrence --

16           THE COURT:  You don't have to be a member of a Cosa

17     Nostra family to be affiliated with a Cosa Nostra family.

18     Would you consider him an associate of organized crime?  Is

19     that what we're talking about here?  I don't see it anywhere

20     in the paperwork, but it would seem that in the traditional

21     sense that your office has identified collaborators with La

22     Cosa Nostra, he could be considered an associate of organized

23     crime.

24           MR. SPEKTOR:  It's not the position we're taking in

25     this case.  I don't have enough evidence to say that he's an

1    associate.  I think the Gambino crime family has used them,

2    but it's too the strong based on evidence we have to call him

3    an associate.

4              THE COURT:  Go ahead.

5              MR. SPEKTOR:  He has boasted with -- we talked about

6    this in the 404(b) motion, about his affiliation with the

7    crime family.  He's used that as part of the extortion, as

8    part of the reputation.  I appreciate the fine line of

9    affiliate and associate, I don't want to overstate the

10   evidence that we do have.

11             THE COURT:  All right.

12             MR. SPEKTOR:  Judge, the final point for general

13   deterrence is it's difficult to prosecute these cases at the

14   state level.  You look at the extortion he's done, it could be

15   viewed in isolation as assault.  It's difficult to deter

16   those.  It's difficult to prosecute them as prove them in

17   isolation because these laborers and truck drivers make

18   reluctant witnesses.  It's only because we've had this

19   investigation with the FBI for five, six years that we're able

20   to put this together.  It was, in part, because of the

21   recording that we have.  We're not always going to have that.

22   It's important to have general deterrence so crimes like this

23   are prosecuted.

24             He talked about how he's gotten away with it for so

25   long.  Talked about in exhibit 1G, how the cops in the Bronx

1      really don't give a fuck.  And he explained in 1R --

2                THE COURT:  About what?

3                MR. SPEKTOR:  About shutting down job sites.  About

4      stopping truck drivers in the middle of road.

5                THE COURT:  Like the Long Island Expressway.

6                MR. SPEKTOR:  And the Cross Bronx Expressway that he

7      mentioned as well, your Honor.

8                Finally, Judge, I want to end by just talking about

9      some of the victims that are perhaps not as apparent from the

10     indictment.  I had a chance to meet with them as I was

11     preparing for trial.

12               Perhaps I was naive, I was only thinking this case

13     through a legal lens.  I was thinking of the business owners

14     who lost money as the victims.  There are the John Does in the

15     Indictment.  As I was preparing for trial, I met with the

16     truck drivers and laborers.  I was really moved to hear from a

17     truck driver who is at the end of a long shift in a dark road.

18     And he's doing -- he has a long shift, he wants to get through

19     his shift, see his family.  And he's stopped by these, what

20     the defendant called them animals, thugs, and threatening him.

21     And they puncture his tires.  Then he starts driving, it's a

22     heavy truck loaded with asphalt, he doesn't have control of

23     the truck.  If he had made a turn without realizing that, that

24     could have been deadly.

25               This is why this case is so serious, that's just one

1  incident.

2         We learned about another truck driver who was

3  punched in his nose, his nose was broken, his glasses were

4  broken.  He couldn't continue working.

5         Those are just some of the people I think that are

6  just as much victims as the named victims in the Indictment.

7  That is why this case so, so serious.  And why general and

8  specific deterrence, counsel is in favor of the top of

9  guidelines, Judge.

10         THE COURT:  Thank you.

11         MR. SAPONE:  May I, your Honor?

12         THE COURT:  Sure, go right ahead.

13         MR. SAPONE:  I want to first introduce the Court to

14  Mr. Bedwell's family in court.  Most notably his two sons

15  referenced in the documents, we have Michael and Christopher.

16         THE COURT:  Thank you.  Thank you for coming.

17         MR. SAPONE:  Yes, your Honor.  So, your Honor, I

18  want to take a step back and say I'm very sorry to have given

19  you that letter.  I hope you'll accept my apology for that.

20  That's not the way I wanted to start today's proceedings.

21         THE COURT:  Okay, that's fine.

22         MR. SAPONE:  So, your Honor.

23         THE COURT:  It has nothing to do with how I will

24  sentence the defendant, one way or the other.  It's just

25  something that I couldn't consider because its pedigree is

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

1      unknown to me.

2                  MR. SAPONE:  Yes, and you're right, your Honor.

3                  THE COURT:  You understand that.

4                  MR. SAPONE:  Yes, 100 percent.

5                  THE COURT:  Go ahead.

6                  MR. SAPONE:  So I learn something there.  And I

7      learned something, your Honor, 14 years ago when I attended a

8      seminar in Long Island and you were on a panel with attorney

9      Benjamin Brafman.  What I learned was regarding sentencing.

10     It was sort of reiterated at the last conference sentence, the

11     whole person, that was something that stuck with me from then

12     throughout my career.  And I thought I would the start today's

13     oral discussion with the whole person.

14                 THE COURT:  Well, I always -- any time I'm with Ben

15     Brafman I'm learning something.  So we all have a lot to learn

16     from a lot of people who are very experienced.

17                 MR. SAPONE:  It trickles down.

18                 So what I was most impacted by, your Honor, in terms

19     of the whole person and Mr. Bedwell's history and

20     characteristics, because make no mistake about it, there are

21     two sides to this man.  Obviously, the one side which you just

22     heard, and the writing was excellent, from the Government.

23     The oral advocacy from the Government was very professional,

24     is that the conduct is reprehensible.  One thing you're not

25     going to hear from me or Mr. Palmieri is anything about that

1   to the contrary.  The conduct is reprehensible, not to be

2   tolerated.  A message has to be sent, no doubt about it.

3          What I want to focus on, following from something

4   your Honor had said in the last conference, let's talk about

5   some of good things.  And one of the good things, the thing

6   that most impacted me, your Honor, is that in 1997 Mr. Bedwell

7   after many years of marriage to a woman named Danielle, that's

8   Michael's mother, Christopher's mother also, in 1997

9   Mr. Bedwell and Danielle had gotten divorced.

10          Approximately four years later Danielle conceived

11   another child, Christopher, with another man.  What most

12   impacts me about this man's history and characteristics is

13   that where someone in his position could let's just say not

14   take any responsibility for someone like Christopher.  It's

15   not his responsibility.  He's not his blood, not his

16   biological child.  Mr. Bedwell is divorced from Danielle.  All

17   Mr. Bedwell needs to do to be a good father was be a father to

18   his son, Michael, and raise him.

19          But what impacts counsel is that as Michael says in

20   Exhibit DD of our sentencing memorandum, no one asked my

21   father to take responsibility for Christopher, yet he did.

22   And when Michael asked his father, Why did you do that all

23   these years?  I believe Christopher is 17 years of age now,

24   why did you raise him like he was your son and be a father to

25   him.  Mom had that relationship after the fact with another

1    man.  The answer was, quote, "No child should be without a

2    friend in life."  And that's the other side to Mr. Bedwell,

3    your Honor.

4              Yes, his mouth and the things that came out of it

5    are reprehensible.  At times the things he did and the things

6    that he said, no excuse.  But there's a man also on the flip

7    side who has, according to all of the letters which are in the

8    double digits, a very big heart and is there for people when

9    no one is looking.

10             I'll share a little about counsel.  I share a

11   certain sentencing committee for the New York Criminal Bar

12   Association.  I'm blessed to travel the country and speak to

13   judges.  Last week I interviewed Judge Amon and Edgardo Ramos

14   from the Southern District of New York.  And what I learned

15   from my travels when sentencing, Courts look at a defendant,

16   it's easy for defendants to do things after they get arrested,

17   after they get caught and a spotlight on them.  So his work in

18   the kitchen for the last year at MDC, I won't even go into

19   that, that's after the fact.  It's when no one is looking, I

20   was taught.  When no one is looking, what is he doing.

21             Yes, there is bad here, no doubt about that.  But

22   also he's helping so many people.  And the letters from the

23   workers are into the dozens about the type of the man that he

24   was on the flip side, the other side to Mr. Bedwell.

25             So I was most struck by him raising that boy for the

1   last 17 years as if he was his own biological child.  He sees

2   no difference between Michael and Christopher, Mr. Bedwell.

3        THE COURT:  You know, people raise children that are

4   not their biological children and love them every day.  And it

5   speaks well of Mr. Bedwell that he embraced Christopher and

6   raised him, and I give him high marks for doing that.  Let me

7   not hesitate to make mention that to you.  It's very important

8   that he recognized a moral or emotional or family obligation

9   based on his relationship with his former wife, and the fact

10  that he wanted to care for and love her son.  I think that

11  speaks very well of him.  So I understand that completely.

12       MR. SAPONE:  Yes, thank you, your Honor.  And the

13  time when he was no longer with her is what strikes me.

14       THE COURT:  Right.

15       MR. SAPONE:  Second is his treatment of Danielle.

16  It's not every day that an ex-spouse goes to bat for someone

17  the way Danielle has gone to bat for Mr. Bedwell.  We've seen

18  it.  What strikes me is when Danielle's mother was on the

19  death bed, I think in the letter from Mr. Bedwell's sister,

20  they are Exhibit A of our sentence memo, they were dating at

21  that point, Mr. Bedwell and Danielle.  Mr. Bedwell promised

22  Danielle's mother that he would always take care of Danielle.

23  He was like 20 years old at the time.  It was such a large

24  statement for a young man to make.  And here we are, all these

25  years later, 2018, and the marriage ended 21 years ago.  And

1   according to Mr. Bedwell's sister, and this Exhibit A, the

2   marriage didn't last but he never stopped caring for Danielle

3   and he's in her life until today.  And she's one of his best

4   friends.

5         I thought that also spoke well of the man because at

6   a time where he's accused of such serious offenses and there

7   is the recording and certain articles that I've read, it would

8   be very easy for an ex-spouse to say, yeah, I knew back then

9   he was no good and turn her back on him.  That's not the case.

10        I think his treatment of her after the divorce and

11  for all these years speaks well of his character also.

12        Thirdly, and maybe this isn't so difficult for a

13  man, but the way he's been with his own son Michael.  I know

14  you read everything, your Honor, I know it was a lot.

15        Briefly in DD Michael says, "My father and I have a

16  dream of owning or own home together and him one day being a

17  grandfather and watching my future children."

18        I think it's wonderful that although Mr. Bedwell was

19  addicted to cocaine, as it says in the memo, for 40 years, his

20  son could have been upset and especially now turn his back on

21  his dad.  He wants to own a home with his dad.  That is a

22  tremendous blessing, that we sit here in court and he's in the

23  back row, and this is what he wants the Court to know.  I

24  think it speaks so well of him.

25        I have seen so many defendants, many of whom are my

1   own clients, when they have that addiction they are not such a

2   good dad, they don't go to work and work hard.  The cocaine,

3   the drugs, really gets to them in a way that makes them

4   useless.  And while Mr. Bedwell's hard work, one of the

5   hardest working people I've read about, all the hours, in no

6   way moves over to the other column in terms of what the

7   Government has said in connection with some of his work.  It

8   shouldn't go without being noticed that he also put tremendous

9   hours into work and cared about the men.  And I was stricken

10  also from all the letters from the workers, not only Mr. Sharp

11  and his affidavit, all the other letters.  There is no doubt

12  in another sense, on another level, nothing to do with the

13  circumstances of this offense, he truly did care about working

14  hard and did it seven days a week.  I think that was very

15  clear in here.

16          Your Honor, I know the case is so serious and if I

17  were the Government I would start with those facts too.  One

18  thing I want to mention, and see if your Honor would consider,

19  the guidelines themselves account for a lot of it because we

20  have a somewhat high-base offense level, which we don't see in

21  other types of criminality.  And it doesn't stop there in

22  terms of the guidelines properly addressing this kind of case.

23  Because we get plus two for the threats of bodily injury, plus

24  four for the leadership, plus two for any monetary loss.

25          And then we accepted full responsibility in the plea

1    agreement, we didn't just plead to Count One and forget about

2    the rest.  We put in there specifically, and consider all the

3    relevant conduct, so we have the grouping.  And the grouping,

4    not like other cases, here adds another two levels.

5           So when we arrive at 51 to 63 month advisory range,

6    I just didn't want it to go unnoticed that this is the type of

7    guidelines analysis, unlike others, where I'm thinking that

8    the guidelines themselves and Congress does get it right on

9    addressing the kind of case that we're dealing with.

10           Your Honor, I don't want to belabor the statistics

11    in terms of the possibility of an upward variance or

12    departure.  What I want to say is this, I want to correct

13    something in my own memorandum.  Which was, before the sort of

14    second half action of the litigation coming up to sentencing,

15    I had asked for 36 months, your Honor probably remembers that.

16           The reason I asked for it is, if your Honor were

17    considering a downward variance the national median for cases

18    like this is 36 months.  I'm no longer asking for that because

19    we're able to learn here.  We're not going to dig our heels in

20    the sand and say but he's a great guy and he's a great father

21    and we're still asking for that.  I want to take that away and

22    ask your Honor to consider 51 months.  That's my formal

23    request to you.

24           And the reason for that is when we look at the

25    guidelines and the argument I just made about the guidelines

1    and Congress adequately addressing this situation, then the

2    question is what about the whole person, what about the rest

3    of the man being sentenced.  This is not someone who has a

4    criminal history category six or a career offender in a

5    category one, as the Government points out.  I know there is

6    some disorder conduct and acquittal in the Bronx.  But it's

7    still a criminal history category one, not like other

8    defendants.

9           There is so much to say as 3553(a)(1) and his

10   history and characteristics, which I'm not going to belabor,

11   it's all in the documents.

12          Because the guidelines adequately address this

13   situation, including all the specific offense characteristics

14   and all the additions that I just mentioned, then you balance

15   that against the other factors of statute, that is what I hope

16   to be considered the rational basis for my request of 51

17   months.

18          In terms of that upward issue.  I would just note,

19   very quickly, that the Government and probation are asking for

20   63 months.  The national average of cases across the board,

21   not just this kind of case, in terms of every single case in

22   federal court in the 13 circuits is a 2.1 percent upward

23   departure or variance.  In this circuit, in the Second

24   Circuit, only 1.1 cases that result that way.  In this

25   courthouse and in Central Islip in the Eastern District of New

1   York, 1.2 percent.

2          But I wanted to be more intellectually with that.  I

3   wanted to share that but then sort of ration it down.  What

4   about extortion and racketeering, it goes up a little bit,

5   it's 2.8 percent in terms of country's average.  And then --

6          THE COURT:  2.8 percent.

7          MR. SAPONE:  Of cases result upward.

8          THE COURT:  Above the guideline.

9          MR. SAPONE:  Above the guidelines in extortion and

10  racketeering cases.

11          Then most specifically, I'll end with this on this

12  part of my presentation.  I looked at 2B3.2, which is cases

13  exactly like this, where there is force or threats of serious

14  bodily injury.  There the national average, I don't have the

15  Eastern District of New York statistics, but only 4.8 percent.

16  So in the country in cases exactly like this one, less than

17  five cases would go up.

18          I think that because Mr. Bedwell does have so much

19  to say in terms of his other side, right, the things that I

20  had mentioned, things on papers, I'm asking you to consider

21  within the guidelines and the 51 months.

22          Roland had said that the things that he said on the

23  MDC recording, which is like a defense lawyer's nightmare,

24  were stupid, he never should have said them.  He wrote you a

25  letter, I know you read it.  But I know he learned a lot from

1  it.

2          One thing I just want to say, your Honor, because I

3  think it's worth mentioning is, in the letter he's concerned

4  about everyone else but himself.  He says, "Here, I let my son

5  and my ex-wife's son down.  I'm all they have.  They deserve

6  better than me.  I'm proud of the man my son Michael has

7  become.  And I count my blessings that I have been able to

8  raise him.  They don't have a large family to support them.

9  It has always been Michael, Chris, and me.  My biggest regret

10 is that I won't be able to be there for Chris, he graduates

11 high school next year."  Mentioning Chris and not Michael as

12 his biggest regret.

13         Then, your Honor, I will end with this, in terms of

14 specific deterrence and whether or not Mr. Bedwell has learned

15 anything in the last year he's been incarcerated, because

16 there is no doubt when we first got here he had just been

17 using obviously and he said those terrible things, which he

18 denounces and takes back.

19         THE COURT:  Which terrible things?  There is so

20 much.

21         MR. SAPONE:  There is so much, there is.

22         THE COURT:  Terrible things, you mean?

23         MR. SAPONE:  Everything, everything he said on the

24 recording is terrible.  And it's selfish.  And he denounces

25 it, your Honor, he takes it all back.

1          The question is, can a man learn after that?  And

2     he's had a lot of time in here.  This is what he says to your

3     Honor, "I could blame the drugs but you and I both know that

4     would be a cop out or excuse.  I have no excuse for my past.

5     You, your Honor, were 100 percent right when you said I

6     minimized my crimes.  I have.  But you should know that I take

7     full responsibility for what I have done and I can tell you,

8     even at 58 years old, I could change thanks to you."

9          I thank you for listening to me, your Honor.

10         THE COURT:  Thank you.  Sir, Mr. Palmieri.

11         MR. PALMIERI:  After following up that, I don't have

12    much that I can say to your Honor other than this, your Honor.

13    I have had a ten-year history with Mr. Bedwell, both in

14    working with him in the union and then in personal

15    representation with him.

16         THE COURT:  You're in private practice?

17         MR. PALMIERI:  Yes, Judge.  And I must reiterate a

18    lot of what Mr. Sapone has said, in that, like all of us there

19    is multiple dimensions to Mr. Bedwell.  There is the man that

20    you read about and you heard about from the Government, and we

21    make no excuse for that.  It was bad.  It was wrong.  It's

22    reprehensible, all the things that Mr. Sapone just said and

23    Mr. Spektor said.  There is no defense to those at this point.

24    Mr. Bedwell, though, has admitted them and taken

25    responsibility for his acts.

1          I had wanted to point out to the Court one thing

2     that I can say personally because I've been with Mr. Bedwell

3     for the better part of ten years, and that is that he's not

4     the same man standing before you today that was the man that

5     was here or the man that you put in jail when you remanded him

6     last year.  In fact, I got to say, that Mr. Bedwell himself

7     has let me know that in a strange way you probably saved his

8     life.  That by taking the actions you took, to put him in and

9     remand him, made him understand what the drug culture was

10    about, in terms of the people he met in MDC.

11         He's personally told me these things.  And I'll put

12    it to you this way, Judge, we represent a lot of people and

13    there is a lot of people who you don't necessarily like but

14    you still have to represent them.  I can tell you, I like

15    Mr. Bedwell.  I can tell you that when he talks to me I know

16    whether he's telling me the truth or whether he's just trying

17    to soak me.  I'm telling you that from speaking to him, this

18    is not the same man.

19         He has learned a valuable lesson that probably saved

20    his life.  Not only did he recognize this to me, but his son,

21    Michael, also stated the same, I believe he put it in the

22    letter.  He indicated to the Court that you probably saved his

23    life.

24         Mr. Bedwell never came across a situation like this

25    before, where he couldn't either bluster his way through or

1   make his threat or whatever it was that was going to get him

2   through it.  He now ran up to the wall and there was no

3   turning back.  You showed him that, Judge.

4           He's had the opportunity to understand that there is

5   a situation here that he can fix, he has the rest of his life

6   to hopefully make good for that.  That's something he put in

7   the letter, which I know you read.

8           So in closing, Judge, I don't want to belabor the

9   point, Mr. Sapone I think covered just about everything I

10  would have said.  In addition, the only thing I can tell your

11  Honor on a personal level is that I have seen the difference

12  between the Mr. Bedwell that was incarcerated on May of 2017

13  and the Mr. Bedwell that stands here this morning.

14          I believe Mr. Bedwell wants the opportunity to

15  address you as well I think, your Honor.  If you recall what

16  he was like and where he was when you remanded him, and you

17  listen to this man today, you will also come to the conclusion

18  that he's a different person.  We would ask you to take all

19  that what was said into consideration when rendering your

20  sentence, Judge.

21          THE COURT:  Thank you.  Does the Government have

22  anything else before I turn to Mr. Bedwell?

23          MR. SPEKTOR:  No, your Honor.  I don't want -- I

24  don't have anything.  Just very briefly, Judge, I'd say two

25  things.  He clearly has excellent lawyers.  I don't want to

1    minimize some of the positive qualities that were mentioned.

2         THE COURT:  He does have excellent lawyers.  What

3    would you like to say?

4         MR. SPEKTOR:  Yes, your Honor.  One thing I'll take

5    issue with is he cares about the workers; because there are

6    certainly workers he doesn't care about.  It's in the

7    recording that we provided to your Honor, 1G.  He says, "You

8    got to sign the contract.  And the workers don't sign, I can

9    replace every single one of them without a problem."

10        So there are workers he doesn't care about.  I think

11   your Honor should weigh those workers along with the workers

12   that have put in letters for him.

13        While I do appreciate Mr. Sapone's analysis of what

14   happens across the nation in cases that are arise out of

15   extortion racketeering, I submit there is no case exactly like

16   this one.  This is a case where there were so many victims.

17   He pled guilty to extorting two victims, but it's been going

18   on for years.  I hope, your Honor, takes that into evaluation

19   when evaluating the statistics.

20        THE COURT:  Mr. Bedwell, is there anything would you

21   like to say before I sentence you?

22   THE DEFENDANT:  Yes, your Honor.  I'm not going to get into

23   all the good stuff, because you've heard all that.  There is

24   no sense going through that.  There is one person that seems

25   to be neglected, that's Officer Borke (ph), my Pretrial

1    Services officer.  She had told me, Mr. Bedwell, you have a

2    good heart but you're heading for disaster.  Stop.

3            I pretty much gave her the, whatever, do what you

4    got to do.  I'm sorry for that.  She was a good person, she

5    didn't deserve that.  She tried.  I blew her off.

6            Other than that, your Honor --

7            THE COURT:  Okay.  Let me say several things in

8    advance of actually sentencing the defendant.  Obviously,

9    sentencing is the most difficult job that the Court has.  And

10   this situation is no different because Mr. Bedwell obviously

11   has certain positive qualities that cannot be ignored.

12           In terms of his caring for his family, his interest

13   in the workers who were members of Local 175, many of whom

14   wrote letters, the Court appreciates everything everyone has

15   said of a positive nature of Mr. Bedwell.  I've taken all of

16   that into consideration.

17           The underlying problem here is that Mr. Bedwell used

18   his position to intimidate, threaten and extort law abiding

19   citizens for the benefit of his employer and for his own

20   benefit.  Because if he hadn't, I assume if he hadn't been

21   building the Local, he would have been pounding the pavement.

22           There is also the issue of his relationship with

23   someone who had involvement, allegedly, with an organized

24   crime family.  I will tell you, in the confines of this

25   courtroom where I have tried a good number of members and

1  associates of organized crime in New York City, that that

2  weighs very heavily upon me.  To combine organized crime with

3  labor is a very, very dangerous formula.  It's very troubling

4  to me.

5          Under 3553(a), the Court must consider numerous

6  factors in imposing sentence.  The nature and circumstances of

7  the offense, the defendant's history and characteristics, the

8  need for the sentence to reflect the seriousness of the

9  offense, to promote respect for the law, and provide just

10 punishment for the offense, the need to sentence to afford

11 adequate deterrence, general deterrence and specific

12 deterrence, and then the need to protect the public.  Clearly,

13 this case touches upon most if not all of those factors.

14          I've reviewed the sentencing documents.  I've

15 considered each of the Section 3553(a) factors in light of the

16 defendant's use of coercion and force in connection with the

17 offense to which he pleaded guilty.  And considering in

18 particular the factors of general deterrence and the

19 importance of punishment for the defendant's behavior.  The

20 Court will sentence the defendant to a guideline sentence,

21 which I will identify in a moment.

22          I had considered a sentence above the guideline

23 because of the very, very serious nature of this offense.  It

24 doesn't really matter to the Court whether he's in criminal

25 history one or criminal history six.  The idea that this

1    defendant would oversee the shutting down of workplaces, the

2    attack on people involved in delivering items to job sites,

3    shutting down or limiting access to highways in the New York

4    City area, there is enough going on in the highways, traffic

5    accidents and so forth that we don't need any help from

6    individuals who are thugs and goons.  But this was part of the

7    strategy of Mr. Bedwell and Local 175's leadership, obviously,

8    because he spoke for the union.  And the Union did not do

9    anything, apparently, to restrain him from his involvement in

10   this kind of extortionate activity.

11          He was the business manager of Local 175.  There is

12   no question in my mind that organized labor is of great

13   importance to this society as a tool to protect the rights of

14   workers.  And to abuse that, to misuse it, to manipulate it in

15   the way that it was manipulated in this case is a great

16   misfortune for our community.  Most unions and their employees

17   behave in a lawful and appropriate way.  And this case should

18   not reflect on the reasonable and appropriate behavior of

19   organized labor to protect the interests of workers.  I want

20   to make that very clear.

21          The idea that you would engage in extortion to

22   increase the number of dues-paying workers, certainly was

23   never contemplated in the National Labor Relations Act.

24          Now, it also put companies that he and his people

25   targeted at risk and put the general public at risk.  The

1    defendant has admitted to many of the incidents of

2    extortionate behavior that were examples of how he did

3    business.  I'm not going to go into the specifics of his

4    statements that were recorded, I think the Government has

5    provided an adequate summary of some of those comments.  But,

6    it is clear that his behavior, his attitude, his statements

7    were of great concern.  and should not only be of concern to

8    the employers and the employees of those companies, but of

9    concern to the general public.

10          There is also the interest of the defendant's

11   caviler attitude towards drugs.  After making his initial

12   appearance before this Court and being released on bail, he

13   tested positive for cocaine on more than three occasions and

14   he lied about his cocaine use to Pretrial Services.  He

15   continued to believe that his drug use was unproblematic.  He

16   stated on a recorded jail call, quote, "I don't have a drug

17   problem.  And I don't give a fuck what anybody says.  I don't

18   do coke every day.  I still don't care.  If I had it in my

19   hands right now I'd probably do a hit right now.  Big deal.

20   Doesn't even fucking phase me.  If I want to fuck off on a

21   weekend with a couple of guys on a Saturday afternoon, so

22   what.  Evidently, it's a big fucking deal," end quote.  And he

23   knew he was being recorded.

24          So who's the real Mr. Bedwell?  The man who wrote me

25   a letter or the man who made that statement?  I hope it's the

1   man who wrote me this letter.

2   THE DEFENDANT:  Your Honor, if I may?

3         THE COURT:  I'm not done.

4   THE DEFENDANT:  Other --

5         THE COURT:  Moreover, the defendant was associated

6   with an organized crime figure.  He reported to Anthony

7   Franco, a made member of the Gambino, or associate, who knows

8   when it was that he was made a member, if he was made a member

9   of the Gambino crime family.  The defendant's victims were

10  fearful not only of the defendant's pension for destructing

11  work projects, but also his connections to organized crime.

12  He extorted one contractor by having Franco accompany him to a

13  meeting with the contractor.  So all of this weighs on the

14  Court's consideration.

15        I think the importance of general deterrence is by

16  far the most important factor in this particular sentencing.

17  Did you want to say something else?  Certainly I'll be happy

18  to hear from you.

19  THE DEFENDANT:  Okay, your Honor, on the point about the phone

20  call and not caring, honestly I didn't at that time.

21        THE COURT:  You did it.

22  THE DEFENDANT:  I did not.

23        THE COURT:  Did not what?

24  THE DEFENDANT:  Did not care, I really did not.  I'm going to

25  be honest with you.

1          THE COURT:  It sounded like that way.

2    THE DEFENDANT:  And two months after that I still didn't care.

3    But what happened was, just so you know for yourself, when

4    somebody tells you that they killed a 17-year old kid over a

5    drug deal that makes you think a little bit.  Maybe not so

6    much as doing the coke itself, but somehow or another that

7    could be involved with that because you're portraying yourself

8    as something when you're not or whatever.  That's what made me

9    think more carefully about what was going on in my life.  Not

10   so much about the use of cocaine, not you locking me up.  The

11   fact that somebody got killed over it and admitted to it and

12   didn't care.

13          THE COURT:  Okay.  In consideration of that comment

14   let me just say, that working in a union where the members do

15   construction, asphalt work, they are in the construction

16   trades, you're not dealing with people who are generally

17   educated to the extent that they have Ph.D's or they have

18   graduated from even a junior college.  These are people with

19   whom you have a relationship, and it's a much more down to

20   earth kind much relationship.  So obviously, you've had

21   experience in dealing with people with all kinds of

22   backgrounds.

23          And I find it difficult to accept that a person who

24   has been using drugs for 40 years and buying them from

25   somebody, doesn't have a basic understanding that drug

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

1    trafficking involves crime including robbery, including

2    murder, and attempted murder.  All you have to do is read the

3    New York Post or the Daily News once in a while to know that

4    this happens all the time.  So I really don't accept this idea

5    that you had a moment of zen because somebody told you that

6    somebody was killed over a drug deal.

7              Are you ready to be sentenced?

8    THE DEFENDANT:  Yes, sir.

9              THE COURT:  I sentence you as follows:  Sixty months

10   in the custody of the Attorney General, three years of

11   supervised release with the following special conditions.  You

12   shall not possess a firearm, ammunition or destructive device.

13             You shall not associate in person, through mail,

14   electronic mail, or telephone with any individual with an

15   affiliation to any my organized crime group, gang or other

16   criminal enterprise.  Nor shall you frequent any establishment

17   or locale where these groups may meet, pursuant but not

18   limited to a prohibition list provided by the Probation

19   Department.

20             You shall not be employed in any position in

21   management or otherwise with a union or other organized labor

22   organization during the period of your supervision.  You shall

23   participate in an out-patient drug treatment program approved

24   by the U.S. Probation Department.  You shall contribute to

25   such treatment not to exceed an amount determined reasonable

1   by the Probation Department's sliding scale for substance

2   abuse treatment services.  And shall cooperate and securing

3   any applicable third-party payment such as insurance or

4   Medicaid.

5          You shall disclose all financial information and

6   documents to the Probation Department to assess your ability

7   to pay.  You shall not consume any alcohol or other

8   intoxicants during and after treatment, unless with a

9   prescription by a licensed physician and proof of the same is

10  provided to the Probation Department.

11         You shall submit to testing during and after

12  treatment to ensure absence from drugs and alcohol.

13         In addition, there is a $100 special assessment,

14  which is mandatory.  I'm not imposing a fine, you do not

15  appear to have the ability to pay a fine.

16         I note that you agreed not to appeal or otherwise

17  challenge the sentence I impose upon you if it is 71 months or

18  below.  However, you have the right to appeal your sentence to

19  the United States Court of Appeals for the Second Circuit if

20  you believe the Court has not followed the law in sentencing

21  you.  I point out that your right to appeal may be affected by

22  your contractual agreement with the Government, which limits

23  your right to appeal.  You should discuss with your attorneys

24  at once whether an appeal will be worthwhile in as much as

25  your time to appeal is so severely limited to 14 days.

1          Do you understand your right to appeal?

2    THE DEFENDANT:  Yes, sir.

3          THE COURT:  Are there open counts?

4          MR. SPEKTOR:  Yes, your Honor.  The Government moves

5    to dismiss Counts One through Three, Five and Six.

6          THE COURT:  The Government's motion is granted.

7          Is there anything else from the Government for

8    today?

9          MR. SPEKTOR:  No, your Honor.

10         THE COURT:  In terms of destination, is there any

11   request?

12         MR. PALMIERI:  We would ask if Mr. Bedwell could be

13   sent to Danbury facility, in Danbury Connecticut or any other

14   facility that's close to the State of New York so that his

15   family could visit with him.

16         THE COURT:  All right.  I can recommend but I cannot

17   require that the defendant be designated by the Bureau of

18   Prisons to a facility in the New York Metropolitan area,

19   either the Danbury y facility or another facility in this

20   locale.

21         Anything else?

22         MR. SAPONE:  Yes, your Honor, one more thing.

23   Counsel notes that because of the type of offense this is,

24   that Mr. Bedwell currently is not eligible for the RDAP

25   program.  But I also note that things are ever-changing in the

1    Bureau of Prisons, and I believe that he could benefit from

2    the RDAP program.  So my request to the Court is, to the

3    extent that he is eligible or shall become eligible based on

4    this record of the 40 years of cocaine use, that this could be

5    recommended if he's eligible.

6                   MR. SPEKTOR:  No objection.

7                   THE COURT:  Your application is granted.

8                   MR. SAPONE:  Thank you.

9                   THE DEFENDANT:  Thank you, sir.

10                   THE COURT:  Anything else?

11                   MR. SAPONE:  I wish everyone well.  Thank you.

12                   THE COURT:  Good luck, sir.

13                   (Whereupon, the matter was concluded.)

14                        *    *    *    *    *

15   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

16

17   Rivka Teich, CSR RPR RMR FCRR
     Official Court Reporter

18

19

20

21

22

23

24

25